BRYAN W. HUGHES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; BRYAN WILLIAM HUGHES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, RespondentHughes v. CommissionerDocket Nos. 9721-89, 16479-89United States Tax CourtT.C. Memo 1994-139; 1994 Tax Ct. Memo LEXIS 123; 67 T.C.M. (CCH) 2561; March 30, 1994, Filed *123 Decisions will be entered under Rule 155. For petitioner: Steven R. Mitchell and Neil Olsen. For respondent: Ann M. Murphy and Patricia A. Golembiewski. DAWSON, PANUTHOSDAWSONMEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: These consolidated cases were assigned to Chief Special Trial Judge Peter J. Panuthos pursuant to section 7443A(b) (4) 1 and Rules 180, 181, and 183. The Court agrees with and adopts the opinion of the Chief Special Trial Judge set forth below. OPINION OF THE SPECIAL TRIAL JUDGE PANUTHOS, Chief Special Trial Judge: Respondent determined the following deficiencies in petitioner's Federal income tax: Additions to TaxYearDeficiencySec. 6653(a)Sec. 6653(b)(1) 1  Sec. 6653(b)(2) Sec.66611979$    15,726$ 786.30------19801,862,334--  $   931,167----19812,175,626--  1,087,813----1982765,705--  382,8522*124 $ 191,42619831,603,327--  801,5642400,78219841,307,638--  653,8192326,91019852,550,631--  1,275,3162637,658 Respondent also determined that petitioner was liable for an addition to tax under section 6654 for failure to pay estimated tax for 1981. Respondent alternatively determined that in the event petitioner was subsequently held not liable for additions to tax for fraud, petitioner would be liable, for 1980, 1981, 1982, 1983, 1984, and 1985, for additions to tax for negligence or intentional disregard of rules and regulations and, for 1981, 1982, 1983, and 1984, for additions to tax under section 6651 for failure to file a return. In an amended answer, respondent seeks an increased deficiency and asserts that petitioner is liable for an addition to tax for fraud for 1979. In the event petitioner is held not liable for an addition to tax for fraud, respondent contends that petitioner is liable for the addition to tax under section 6653(a) originally determined in the notice of deficiency for 1979. After concessions, the issues for decision are: (1) Whether the period of limitations under section 6501 on assessment and collection of tax from petitioner for 1981 *125 had expired prior to the time respondent issued her notice of deficiency; (2) whether petitioner's claimed contribution in 1979 of certain funds and assets to the Universal Life Church of Long Beach, California (ULC-LB) is properly deductible under section 170; (3) whether ULC-LB, a chapter of the Universal Life Church established by petitioner, was a church exempt from income tax under section 501(c)(3); (4) whether certain deposits to bank and brokerage accounts in ULC-LB's name represented petitioner's unreported taxable income; (5) whether certain deposits to bank accounts in petitioner's and his brother's names represented petitioner's unreported taxable income; (6) whether gains recognized with respect to certain real property sale transactions represented petitioner's unreported taxable income; and (7) whether petitioner is liable for the additions to tax. FINDINGS OF FACT Some of the facts were stipulated and are so found. Petitioner Bryan William Hughes was a resident of Long Beach, California, at the time his petitions were filed. Petitioner's Background and FamilyPetitioner was born in England on August 6, 1929. He attended a Church of England school until he was 17 or *126 18. The school provided a general education and was comparable to parochial schools in the United States. He attended the school on a scholarship. Petitioner subsequently left England and emigrated to Canada in 1956 or 1957. In the early 1960s, he moved to the United States and settled in Long Beach, California. Petitioner later became a U.S. citizen. Petitioner's parents and his brother, Philip Hughes, joined petitioner and also settled in Long Beach, California. Petitioner's work experience has been varied and colorful. After arriving in Long Beach, California, petitioner worked as a professional wrestler and taught classes in self-defense. Although he apparently arrived in Long Beach, California, with few financial resources, 2 petitioner eventually acquired substantial assets and financial net worth as a result of successfully investing in real estate. In his first real estate investment, petitioner purchased and renovated a run-down apartment building. After completing its renovation, he refinanced the property and obtained a bank loan based on the increased value of the apartment building. The loan proceeds enabled him to acquire other residential real properties. He *127 successfully repeated this process of acquiring, renovating, and refinancing residential real estate. Since about 1973, due to his successful investments, petitioner had ceased working as a paid employee for others and has lived on his investment income. Petitioner possesses considerable experience, knowledge, and skill with respect to making and managing various types of investments. Besides investing in real estate, petitioner successfully invested in real estate mortgage loans and in silver as a commodity. Petitioner's brother, Philip Hughes, is also experienced and knowledgeable with respect to making investments and loans. Philip Hughes, at one time, was employed as a credit manager with General Electric Credit Corporation (GECC). He worked at GECC's office in Venice, California, for approximately 10 years until 1971. Prior to their death, petitioner's parents lived with petitioner. Petitioner's father died in 1976 and his mother died in 1981. Petitioner had a collection of approximately nine antique automobiles, including a Bentley. He also amassed a considerable *128 collection of antique silver, which included such items as serving platters, soup tureens, and tea sets. Prior to the years in issue, petitioner took an interest in and became actively involved in the activities of various charitable organizations in the Long Beach, California, area. Petitioner has a very good reputation in the Long Beach civic community. He is generally known to be strongly committed to and very supportive of charitable activities directed to alleviating the community's social problems. He has served on the boards of several charitable organizations. Until 1977, petitioner was an Episcopalian. While an Episcopalian, he had not been active in the Episcopal Church for many years. Both before and after 1977, practically all of the charitable community work petitioner engaged in was not of an ecumenical nature. Universal Life Church, Inc., of Modesto, CaliforniaThe Universal Life Church, Inc., of Modesto, California (ULC-Modesto), was incorporated in 1962. Petitioner first became aware of ULC-Modesto in early 1977. During 1977, petitioner attended perhaps up to nine lectures or meetings in Los Angeles or Long Beach, California, conducted by officials or members *129 of ULC-Modesto. He also received materials from ULC-Modesto, including a book entitled "The Universal Life Church". "The Universal Life Church" book provided to petitioner contained a 1975 newspaper article on a speech by Kirby Hensley (ULC-Modesto's founder and president) to a group in El Paso, Texas. The following is an excerpt from this article: He is in El Paso to address a group at the Church of Universal Love, chartered by him, on his way to a two-day seminar and convention on religious freedom, to be held Saturday and Sunday, at North Park Inn, Dallas. "I'll ordain anybody, no questions asked, charter his church, and tell him how to get part of his income tax free," Bishop Hensley said. "Actually, I'm against anyone not paying income tax when the rest of us do, churches included. In the average city, about one third of the income tax goes free. "About 90 percent of everything is church business," he said, "but you're so used to it, you're not conscious of it. "Look at your watch, and you're running on 'church time.' The calendar, too. "And there ain't nobody up in the sky running the show." "The regular church stands as a doorway between you and God. Well, I stand between *130 you and the state; I'll protect you from the IRS."Identical views are expressed in many passages appearing throughout "The Universal Life Church" book. During the period from April 13, 1976, through August 27, 1984, ULC-Modesto was recognized by the Internal Revenue Service (IRS) as qualifying for exemption from Federal income tax under section 501(c)(3). See Universal Life Church, Inc. v. United States, 13 Cl. Ct. 567, 568 (1987), affd. per curiam without opinion 862 F.2d 321 (Fed. Cir. 1988). 3*131 In 1978, petitioner was ordained as a minister of the Universal Life Church. 4 After he was ordained, petitioner was not required to function or serve as a minister in the community by ULC-Modesto. 5*132 ULC-LB6*133 As indicated above, among the materials petitioner received from ULC-Modesto was "The Universal Life Church" book. Petitioner read and reviewed the book, including its discussion about taxes. The book contained significant amounts of tax advice. It stated, among other things, that an individual could deduct up to 50 percent of his income by establishing a Universal Life Church congregation. The book further stated that Universal Life Church chapters were not required to apply to the IRS for recognition of their tax-exempt status, because ULC-Modesto and its affiliated congregations together constituted a tax-exempt single church. 7 It advised that Universal Life Church chapters were not required to file *134 annual returns with the IRS. During 1979, petitioner considered establishing his own chapter of the Universal Life Church in Long Beach, California. Petitioner sought advice from his personal attorney John Carroll (Carroll) and from John Grissom (Grissom), the certified public accountant who prepared petitioner's returns, regarding such action. Petitioner consulted Carroll only regarding the formation of a Universal Life Church chapter. Petitioner provided to Carroll "The Universal Life Church" book that petitioner previously received from ULC-Modesto. Grissom had previously advised petitioner not to join the Universal Life Church. He further advised petitioner not to claim a charitable deduction for the large transfer of funds petitioner contemplated making to his proposed Universal Life Church chapter. In late 1979, petitioner decided to proceed and establish his own Universal Life Church chapter, ULC-LB. A Universal Life Church charter, dated December 2, 1979, was issued by ULC-Modesto to ULC-LB. ULC-LB is not a corporation, partnership, or joint venture. 8*135 The formational meeting of ULC-LB was attended only by petitioner, Philip Hughes, and their mother. The initial bylaws adopted, dated December 5, 1979, stated that "the church shall be funded by the Hughes family only" and that no contributions will be accepted from any other persons or entities. The bylaws provided that petitioner would be the presiding *136 officer or pastor, and that a board of directors would be appointed of not less than five members, including the pastor. The bylaws stated that the primary purpose of ULC-LB would be charity, primarily in the City of Long Beach, and proposed that the specific causes be defined by the board of directors within 90 days. Under the initial bylaws, all directors and officers of ULC-LB were to serve without compensation. The bylaws further stated that upon the death of all the officers, the assets of ULC-LB would become the property of ULC-Modesto. A resolution of ULC-LB's board of directors, dated December 7, 1979, proposed that petitioner or Philip Hughes act alone for ULC-LB. The minutes of a ULC-LB board of directors meeting, dated December 14, 1979, named Carroll as ULC-LB's attorney and Helen Miller (who later served as petitioner's accountant) as its accountant. The minutes of a ULC-LB board of directors meeting, dated January 12, 1980, reflected that articles for ULC-LB's formation were approved and adopted. The articles stated that ULC-LB is an association which is a "non profit public benefit church". The articles stated that its charitable and public purposes were as follows: *137 To gather and unite in fraternity and friendship all members of the Universal Life Church community in the United States. To help raise the economic, educational and social levels of the residents, principally, of Los Angeles County including primarily members of the minority community who are substantially disadvantaged, underemployed, to foster and promote community-wide interest and concern for the problems of these residents to the end that educational and economic opportunities may be expanded, poverty crime and environmental problems may be lessened, racial tensions, prejudice and discrimination may be eliminated. To expand the opportunities available to said residents and groups to own, manage and operate business enterprises in economically depressed areas, and to assist these residents in obtaining financial support from Church resources and other sources.In the articles adopted, seven individuals were named to serve as directors of ULC-LB until the selection of their successors. Three of the directors were petitioner, Philip Hughes and their mother. Petitioner was also named as ULC-LB's pastor and chairman and Philip Hughes was named as its treasurer. Another individual, *138 Mary Lonn, was named as ULC-LB's secretary. The articles further provided that -- all property of this corporation is irrevocably dedicated to charitable and public purposes. On the dissolution of this Congregation all assets remaining after payment of all debts and liabilities of this Congregation shall become the property in entirety of our Mother Church * * * [ULC-Modesto] * * *, for whatever uses they wish. 9ULC-LB records in evidence include minutes for only 14 ULC-LB board of directors meetings during the period from *139 December 2, 1979 through December 21, 1985. These minutes indicate that board of directors meetings were held on: December 2, 1979; December 7, 1979; December 14, 1979; January 24, 1980; May 21, 1980; May 23, 1980; December 12, 1981; June 14, 1982; September 27, 1982; October 4, 1983; October 3, 1984; August 17, 1984; November 19, 1984; and December 21, 1985. These minutes generally do not specify or name the directors in attendance at the board of directors meeting. A number of the minutes were apparently prepared and signed only by petitioner. ULC-LB records in evidence do not reflect whether any individuals besides the seven individuals named in the January 12, 1980, articles, were ever selected to serve as directors of ULC-LB. According to certain bylaws in evidence, directors were to be selected annually on each January 12. Under these bylaws, directors would be elected for 3-year terms and could be reelected for subsequent 3-year terms. A vacancy would be deemed to exist where a director died, resigned, or was removed. These bylaws further require a minimum of seven monthly meetings of the board of directors to be held during each year. The ULC-LB records in evidence *140 further do not reflect how directors were to be selected and do not indicate who would vote on their election or reelection to the board of directors. From 1979 through 1985, petitioner placed considerable funds and assets in the name of ULC-LB. He opened bank accounts in its name and transferred real property in its name. Petitioner made extensive investments in the name of ULC-LB during this period. Although petitioner placed considerable funds and assets in the name of ULC-LB, from 1979 through 1985, petitioner continued to hold other funds and assets in his own name. Petitioner also made investments in his own name. However, these investments were generally much smaller in amount than the investments petitioner made on behalf of ULC-LB. During the period from December 2, 1979, through September 1992, ULC-LB's office and operational headquarters was located in petitioner's personal residence. The Amadeus FoundationThe Amadeus Foundation was incorporated as a California nonprofit corporation on March 8, 1991. It was incorporated to serve as a successor to ULC-LB. Petitioner was named as the president of the foundation and as a member of its board of directors. Petitioner authorized *141 his then counsel, Woodford Rowland, to file an application for exemption with the IRS. An application was originally submitted seeking exemption under section 501(c)(4); however, it was later supplemented as an application seeking section 501(c)(3) status. The application stated, among other things, that "The foundation has disassociated itself from * * * [ULC-Modesto], because of improprieties in the conduct of that corporation". 101979 Transfer to ULC-LBAs indicated above, petitioner, during 1979 through 1985, placed considerable funds and assets in the name of ULC-LB. In December 1979, petitioner transferred funds and assets having a claimed total fair market value in excess of $ 1 million in the name of ULC-LB. The $ 1 million of assets included $ 250,000 cash, five real estate mortgage loans secured by trust deeds, and approximately $ 250,000 of silver *142 bullion. With respect to the $ 250,000 cash petitioner placed in the name of ULC-LB in 1979, petitioner obtained a bank cashier's check for $ 250,000 payable to ULC-LB. Philip Hughes (petitioner's brother and ULC-LB's treasurer) deposited the check into a checking account opened in ULC-LB's name. Petitioner and Philip Hughes had sole signatory authority over the account. The five real estate mortgage loans placed in the name of ULC-LB had previously been obtained by petitioner in connection with his prior sales of those real properties. The silver bullion petitioner placed in the name of ULC-LB consisted of pure silver bars weighing either 10 troy ounces or 100 troy ounces, 11 with a combined weight in excess of 800 pounds. Following petitioner's transfer of the silver bullion to ULC-LB, the bars continued to be stored in petitioner's personal residence. Most of the silver bars placed in the name of ULC-LB in 1979 were sold in 1980. Petitioner advised ULC-Modesto of the 1979 transfer. ULC-Modesto issued petitioner a "receipt" with respect to the funds and assets petitioner transferred to ULC-LB in 1979. The "receipt" *143 reflected that petitioner had contributed $ 1,006,370.95 to ULC-Modesto. ULC-LB InvestmentsA. Generally.During 1980 through 1985, petitioner made numerous investments on behalf of ULC-LB. These investments included certificates of deposit, short-term loans to businesses and individuals, real estate mortgage loans, real estate, antique silver, and silver bullion. Petitioner alone decided how to expend ULC-LB's funds and made all investment decisions for ULC-LB. Philip Hughes never had any knowledge of what was held in ULC-LB's treasury. Philip Hughes did not know that ULC-LB engaged in making loans or in purchasing and selling real estate. He had no knowledge or control with respect to the numerous bank and brokerage accounts which petitioner opened in ULC-LB's name. Petitioner, at times, would sign Philip Hughes' name to various documents. B. Certificates of deposit.The minutes of a ULC-LB board of directors meeting, dated January 24, 1980, reflected that the board approved payment of an advance of $ 5,000 on petitioner's "minister's allowance". The minutes state that the funds would be used by petitioner to purchase a large certificate of deposit which would be transferred to *144 ULC-LB. Petitioner used the $ 5,000 and other personal funds to purchase a $ 100,000 jumbo certificate of deposit. A jumbo certificate of deposit is a certificate of deposit which is $ 100,000 or more. During 1980 through 1985, jumbo certificates of deposit generally paid an interest rate that was 2 or 3 percentage points more than the interest rate paid on smaller non-jumbo certificates of deposit. Petitioner transferred the $ 100,000 certificate of deposit to ULC-LB. ULC-LB received the principal and interest when the certificate of deposit subsequently matured. Other certificates of deposit were purchased by ULC-LB during 1980 through 1985. In early 1985, ULC-LB purchased in excess of $ 1.9 million in certificates of deposit from Sumitomo Bank. C. Loans to Long Beach Classic Imports.Long Beach Classic Imports was a car dealership in Long Beach, California, that specialized in imported used luxury cars, such as Bentleys, Ferraris, Masseratis, and Rolls Royces. Long Beach Classic Imports was operated by Andrew McCarthy (McCarthy), a friend of petitioner. ULC-LB loaned money to Long Beach Classic Imports to finance the dealership's purchase of cars. Such financing arrangements *145 are referred to as "flooring a dealer's inventory". The dealership would generally repay the loans when it sold the cars. From 1980 through 1985, ULC-LB made loans to Long Beach Classic Imports totaling the following amounts: YearAmount1980$ 123,0331981137,189198237,245198349,7551984336,72919855,000An interest rate of 10 percent was charged on the money loaned Long Beach Classic Imports. The term of the loans ranged from 30 days to 9 months, depending on when the cars financed were sold. ULC-LB also made a mortgage loan of $ 25,000 to McCarthy and McCarthy's wife in 1982. It made two additional loans totaling $ 10,000 to McCarthy in December 1984. Petitioner, in his individual capacity, also loaned money to Long Beach Classic Imports. Ultimately, ULC-LB was not financially successful in its dealings with Long Beach Classic Imports. The dealership was closed down and its cars were seized after customs authorities discovered that McCarthy had forged certain of the importation documents under which the dealership had brought its cars into the United States. As a result, ULC-LB was unable to collect on the large outstanding loans it had made to the dealership. D. Real estate mortgage *146 loans brokered by Robert Pack.Robert Pack (Pack) was a licensed mortgage broker who conducted his real estate mortgage brokerage business through his corporation, Robert T. Pack, Inc. Pack was one of perhaps six mortgage brokers with whom petitioner dealt. During 1980 through 1985, the State of California usury statute limited the interest rate which individuals could charge as lenders on loans in California. Further, individuals who were lenders could not charge points on loans. Mortgage brokers who operated through corporations were not subject to these limitations. As a result, individuals or entities who desired to invest in real estate mortgage loans paying higher interest rates and affording higher yields, typically would purchase loans from a mortgage broker. 12The mortgage broker's corporation initially would serve as the lender on the loan. The corporation would then assign the loan to the investor purchasing the loan. 13*147 Pack had customers who sought to borrow money by receiving loans secured by second mortgages on their real property. The interest rates and points paid on such second real estate mortgage loans were substantially higher than the interest rates and points that would be paid on first real estate mortgage loans obtained from a bank. In most instances, however, it was not advantageous for Pack's customers to refinance the property by obtaining a new first mortgage loan from a bank. In many cases the interest rate on their existing first mortgage loans was much lower than the current interest rates that would be charged on a new first mortgage loan. During 1980 through 1985, banks also generally would not lend money on the basis of a second mortgage. Both petitioner, individually, and ULC-LB invested in second real estate mortgage loans arranged by Pack. From 1980 through 1985, ULC-LB invested in at least 50 second mortgage loans brokered by Pack. These second mortgage loans generally ranged from $ 18,000 to $ 50,000. The term *148 of the loans was generally 2 or 3 years. Most, if not all, of the loans required the borrower to make a balloon repayment of the loan principal at the end of the loan term. Petitioner would advise Pack of the interest rate petitioner wanted on the loan and the number of points to be charged the borrower. Pack would receive half of the points as compensation for brokering the loan. The loans in which petitioner and ULC-LB invested generally paid an interest rate which was 6 or 7 percentage points above the then prevailing bank prime rate in the Long Beach, California, area. The borrower would also be charged up to 10 points. The borrowers would generally not know that petitioner and ULC-LB were the source of the borrowed funds. The loan documentation reflected Pack's corporation to be the lender and the beneficiary of the second mortgage on the real property. Pack's corporation would then assign the loan and its beneficial interest in the second mortgage to petitioner and ULC-LB. Pack also served as a collection agent on the loans he brokered for petitioner and ULC-LB. He further operated another corporation which handled foreclosures on the mortgages he brokered. During 1980 *149 through 1985, petitioner and ULC-LB acquired title to certain real properties after foreclosing on the delinquent mortgage loans. In a number of instances petitioner or ULC-LB assumed the first mortgage loan to which the property was subject. 14E. Real estate sale transactions and rentals.As indicated above, petitioner transferred certain real estate mortgage loans to ULC-LB in December 1979. The mortgage loans were issued by petitioner in connection with his prior sales of those real properties to third parties. From 1980 through 1985, petitioner transferred various real properties to ULC-LB. He also had ULC-LB purchase certain real properties. *150 ULC-LB further acquired other real properties through loan foreclosures. Many of ULC-LB's real properties were sold during 1981 through 1985. From 1979 through 1985, petitioner owned certain real properties. In many instances title records reflected that petitioner and Philip Hughes were the owners of the real property. Although the title records on the properties reflected that Philip Hughes, at some point, held record title, Philip Hughes had no knowledge or control with respect to the real estate transactions described below. Philip Hughes also was not involved in the prior transfer of various real properties to ULC-LB. Petitioner, at times, signed Philip Hughes' name to various documents. During 1978 and 1979, petitioner sold four real properties under the installment sale method. Title records reflected that petitioner and Philip Hughes were the owners of the properties sold. Petitioner transferred the installment notes to ULC-LB in December 1979. The respective dates of sale and the taxable gain recognized on the four transactions during 1980 through 1985 are as follows: Date ofTaxable Gain Recognized (LTCG)Property Sale1980 1981 1982 1983 19841985 1211 Magnolia06-08-78------$ 133,761----1121-112911-16-78$ 516$ 519$ 622625$ 44,906--Locust Ave.1827 East11-29-78----------$ 101,8464th St.201-209 East12-01-791,1251,2421,9801,51643,420Unknown12th St.During *151 1981 and 1982, petitioner sold two real properties, 2149 Earl Avenue and 724 West 4th Street, respectively. Title records reflected that petitioner was the sole owner of 2149 Earl Avenue and that petitioner and Philip Hughes were the owners of 724 West 4th Street. Petitioner previously had acquired the two properties through foreclosure, on May 8, 1981, and October 27, 1981, respectively. The respective dates of sale and the taxable gain recognized on the two transactions during 1981 through 1985 are as follows: Date ofTaxable Gain RecognizedPropertySale1981198219832149 Earl Ave.9-3-81$ 2,520 OI, --  --  7,876 STCG724 West 4th St.11-13-82--  $ 159 OI$ 4,084 OI, 690 STCGDuring 1982, ULC-LB sold three real properties, 635 East 9th Street, 233 Newport Avenue, and 801 St. Louis Avenue. On January 10, 1984, ULC-LB exchanged 2825 East 7th Avenue for another real property in a tax-free exchange. All four real properties sold or exchanged were transferred to ULC-LB by petitioner. Title records reflected that the four properties previously had been purchased by petitioner and Philip Hughes. The respective dates on which the four real properties were purchased by petitioner, dates of *152 transfer to ULC-LB, dates of sale or exchange, and the taxable gain recognized on the transactions during 1982 through 1985 are as follows: Date ofTaxable Gain RecognizedDate ofDate ofSale or(LTCG)PropertyPurchaseTransferExchange198219831984233 Newport Ave.10-21-7905-30-8006-11-82$ 85,560-- $ 42,780635 East 9th St.11-07-7405-28-8010-19-8279,579-- -- 801 St. Louis04-17-7305-28-8011-05-8225,371$ 46,000-- Ave.2825 East 7th06-20-7805-28-8001-10-84-- -- -- Ave. During 1983 and 1984, ULC-LB sold three real properties, 1449-1455 Cedar Avenue, 1114-1122 Gladys Avenue, and 1074 Ximeno Avenue. All three real properties sold were transferred to ULC-LB by petitioner. Title records reflected that the three real properties previously were acquired by petitioner and others through foreclosures. The records reflect that petitioner, Philip Hughes, and Stefan and Edna Malan were the owners of 1449-1455 Cedar Avenue prior to its transfer to ULC-LB, and that petitioner was the sole owner of both 1114-1122 Gladys Avenue and 1074 Ximeno prior to their transfer to ULC-LB. The respective dates of acquisition through foreclosure, dates of transfer to ULC-LB, dates of sale, and the taxable gain recognized *153 on the transactions during 1983 through 1985 are as follows: Date ofAcquisitionTaxable Gain RecognizedThroughDate ofDate of(LTCG)PropertyForeclosureTransferSale198319841985 1449-145508-25-8210/19/8310-19-83$ 18,217----Cedar Ave.1114-112108-17-821-23-842-23-84--$ 13,716$ 249,633Gladys Ave.1074 Ximeno09-18-8211-10-8310-3-84--1,973--Ave.During 1981, 1982, 1984, and 1985, ULC-LB sold five real properties which it previously had purchased. The respective dates of purchase, dates of sale, and the taxable gain or loss recognized on the transactions during 1981 through 1985 are as follows: Date ofDate ofPropertyPurchaseSale240 West Anaheim St.03-20-8007-03-811810 East Pacific Hwy.03-12-8407-08-82716 Flint Ave.10-04-8310-08-841237 East 7th St.03-02-8212-05-841327 East 4th St.01-13-8406-07-85Taxable Gain or (Loss) Recognized (LTCG/(LTCL))Property19811982198319841985240 West Anaheim St.$ 6,391$ 11,860------ 1810 East Pacific Hwy.-- 8,452------ 716 Flint Ave.-- ----$ 35,060$ 1,771 1237 East 7th St.-- ----196,536-- 1327 East 4th St.-- ------(25,914)During 1980, 1982, 1983, 1984, and 1985, ULC-LB sold eight real properties which it previously acquired through foreclosure. The respective dates *154 of acquisition through foreclosure, dates of sale, and the taxable gain recognized on the transactions during 1980 through 1985 are as follows: Date ofAcquisitionthroughDate ofPropertyForeclosureSale1660-1662 Grand Ave.05-06-8006-23-802486-2488 1/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-11-82Pasadena Ave.50 Covina Ave.08-11-8206-06-831077 Euclid Ave.03-10-8310-26-83580 East Pleasant03-21-8303-16-843900 Gardenia03-26-8410-29-841308 East 7th St.11-29-8411-29-8416131 Eucalyptus10-06-8202-22-85Taxable Gain RecognizedProperty19801981198219831660-1662 Grand Ave.----$ 8,070 LTCG--2486-2488 1/2----5,669 STCG--Pasadena Ave.50 Covina Ave.------$ 4,922 OI,--11,842 STCG1077 Euclid Ave.------9,606 STCG580 East Pleasant--------3900 Gardenia--------1308 East 7th St.--------16131 Eucalyptus--------Taxable Gain RecognizedProperty198419851660-1662 Grand Ave.----2486-2488 1/2----Pasadena Ave.50 Covina Ave.--$ 21,654 STCG1077 Euclid Ave.----580 East Pleasant$ 2,233 OI7,315 STCG33,065 STCG3900 Gardenia30,453 STCG--1308 East 7th St.17,906 STCG--16131 Eucalyptus--343,312 STCGOn December 1, 1982, 1755 Junipero Avenue was sold. Title records reflected that ULC-LB purchased a 50-percent interest in the property on December 24, 1980, *155 and that petitioner purchased the other 50-percent interest in the property on July 27, 1982. On October 31, 1984, 1845-1851 Pine Avenue was sold. Title records reflected that ULC-LB, petitioner and Philip Hughes, acquired the property through foreclosure on September 13, 1984, and that ULC-LB held a 98-percent interest and petitioner and Philip Hughes held the remaining 2-percent interest. The respective dates of sale and the taxable gain recognized during 1982 through 1985, are as follows: Taxable Gain Recognized PropertyDate of Sale19821983198419851755 Junipero Ave.12-1-82$ 13,809 LTCG,------13,809 STCG 1845-1851 Pine Ave.10-31-84--    ------For 1980 through 1985, the following table 15 summarizes the total annual taxable gains recognized with respect to the real estate transactions described above: Taxable Gain198019811982Short-Term Capital Gain (STCG)--$ 7,976$  13,809Long-Term Capital Gain (LTCG)$ 1,6418,153240,364Ordinary Income (OI)--2,502159Taxable Gain198319841985Short-Term Capital Gain (STCG)$  22,138$  81,424$  38,969Long-Term Capital Gain (LTCG)200,119378,391670,648Ordinary Income (OI)9,0062,233-- Although petitioner contends that he made additional improvements to *156 some of the real property prior to their sale, he generally failed to establish that such improvements, in fact, were made. Petitioner further failed to establish the cost of the alleged improvements. As a result, the taxable gain on the real estate sale transactions is not to be reduced for such alleged improvements. During 1980 through 1985, petitioner collected substantial rental income from various real properties he individually owned. Most of this rental income was not reported on his tax returns. When petitioner subsequently transferred *157 rental property to ULC-LB, he did not advise the tenants of the change in ownership. Lease agreements for ULC-LB's rental properties did not identify ULC-LB as the lessor. Petitioner served as the collection agent for the rents on ULC-LB's rental properties. All of the real property petitioner transferred to ULC-LB was subject to mortgages. The mortgage holders were never advised of petitioner's transfer of the property to ULC-LB. Petitioner continued to make the mortgage loan payments. 16F. Silver transactions.Petitioner transferred his collection of antique silver to ULC-LB. To be considered antique, a silver item must be at least 100 years old. As indicated above, petitioner *158 transferred approximately $ 250,000 of silver bullion to ULC-LB in 1979. Most of the silver bars were sold in 1980. From 1981 through 1985, ULC-LB purchased antique silver, silver bullion, and silver dollars from six dealers in the following amounts: Antiques D'Argent -- antique silver and silver bullionYearAmount1983$ 40,85019845,000Total$ 45,850Clive Blunt -- antique silver and silver bullionYearAmount1981$  25,2901982280,584198332,470198417,395Total$ 355,739English Heritage -- antique silver and silver bullionYearAmount1983$ 19,10019855,000Total$ 24,100Michael McHale -- silver bullionYearAmount1983$ 18,91019842,700Total$ 21,610Rare Coin Galleries -- silver bullion and silver dollarsYearAmount1984$ 108,4001985371,112Total$ 479,512Joel Rettew -- silver bullion and silver dollarsYearAmount1985$ 41,960From 1980 through 1985, petitioner also purchased silver in his own name from the above dealers. However, the amounts purchased in petitioner's own name were much smaller than the amounts purchased in ULC-LB's name. For most of the period from 1980 through 1985, all of the antique silver, silver bullion, and silver coins acquired by ULC-LB were stored at petitioner's personal residence. *159 17 While some silver was stored in the basement, a large number of the antique silver items were kept in the house's common living areas. They were displayed in large cabinets where they could be seen by visitors to petitioner's home. In late 1984 or early 1985, petitioner decided to have ULC-LB sell some of its antique silver. To help market the antique silver offered for sale, a catalogue was prepared. The catalogue listed prices totaling in excess of $ 876,000. Subsequently, another page listed an additional 28 lots of antique silver items was added to the catalogue. The listed prices of these additional items totaled $ 78,000. Some of ULC-LB's antique silver was sold in 1985. None of ULC-LB's silver was sold after 1985. As of the time of trial, ULC-LB still had the antique silver, silver bullion, and silver coins which it had at the end of 1985. ULC-LB Bank and Brokerage AccountsDuring 1979 through 1985, ULC-LB had 26 bank accounts with six financial institutions and three brokerage accounts with three financial services or investment companies. These accounts *160 were as follows: Financial Institution, Financial Services Co., orAccount No.Investment Co.Coast Federal Savings & Loan1-044873-61-047918-61-044885-01-045548-31-046397-41-04671-71-046407-10-356194-1Farmers & Merchants Bank8-0144348-70198-903-29233-9Long Beach Savings & Loan51-02098-051-0285-651-02501-351-02113-751-02605-251-02061-851-02117-851-03065-851-04023-651-05618-251-02098-0National Bank of Long Beach412-012097Progressive Savings & Loan52-19218-452-21791-6Sumitomo Bank68-526329American Capital Government6700095104-2E.F. Hutton64-98665Franklin Fund10156854427 Petitioner and Philip Hughes were the only individuals possessing signature authority over the 29 accounts. Philip Hughes, however, did not have any knowledge or control with respect to such 29 accounts. During 1980 through 1985, the following total gross deposits were made into the 29 accounts: YearGross Deposits1980$ 1,766,16619814,008,49519823,811,08819833,558,15819844,826,61719856,173,984Of the total gross deposits made into the 29 accounts, during 1980 through 1985, the parties have stipulated there were the following deposits attributable to nontaxable sources, deposits attributable to taxable income sources, and disputed *161 deposits which the parties cannot agree are attributable to nontaxable or taxable income sources: YearNontaxable Deposits Taxable DepositsDisputed Deposits 1980$  898,565$ 576,164$   291,43719812,064,516533,1731,410,80619822,377,158650,052783,87819832,040,892792,760724,50619842,839,325806,5731,180,71919855,335,386683,616154,982None of the taxable deposits listed above include gains from real property sales. Petitioner contends that the disputed deposits listed above are attributable to both nontaxable return of capital sources and taxable income sources. Petitioner's Personal Bank AccountsDuring 1980 through 1985, petitioner had 11 bank accounts with three financial institutions. These accounts were as follows: Financial Institution Account No.Coast Federal Savings & Loan9-196499-91-044680-51-044680-51-044952-81-045100-31-045184-71-045127-6Farmers & Merchants Bank3-04276-63-37507-2Progressive Savings & Loan52-17893-652-217908Many of the accounts were titled as joint accounts of petitioner and Philip Hughes. Petitioner and Philip Hughes were the only individuals possessing signature authority over the 11 accounts. Philip Hughes, however, did not have any knowledge or control with *162 respect to such 11 accounts. During 1980 through 1985, the following total gross deposits were made into the 11 accounts: YearGross Deposits1980$ 2,351,4581981496,5761982761,5291983383,2651984263,3361985116,963Of the total gross deposits made into the 11 accounts during 1980 through 1985, the parties have stipulated there were the following deposits attributable to nontaxable sources, deposits attributable to taxable income sources, and disputed deposits which the parties cannot agree are attributable to nontaxable or taxable income sources: YearNontaxable Deposits Taxable DepositsDisputed Deposits 1980$ 1,428,258$ 315,024$ 608,1761981208,27988,194200,1031982341,146101,280319,1031983274,16764,89144,2071984184,22439,38839,724198595,82012,6388,505The parties agree that the taxable deposits listed above represent taxable income to petitioner. None of the taxable deposits listed above includes gains from real property sales. Petitioner contends that the disputed deposits listed above are attributable to both nontaxable return of capital sources and taxable income sources. Petitioner's Tax ReturnsPetitioner retained an accountant to prepare his 1979, 1980, 1981, 1982, 1983, 1984, and *163 1985, returns. Petitioner's 1979 and 1980 returns were prepared by Grissom, a certified public accountant. The other returns were prepared by Helen Miller (Miller), another accountant whom petitioner subsequently retained. Petitioner gave his accountants only the information and documentation that petitioner felt was relevant. Petitioner failed to file a 1981 income tax return. The 1981 return which Miller prepared for petitioner was not accepted by the IRS as a proper return. The return submitted to the IRS was neither sworn to nor signed by petitioner. Petitioner's 1982, 1983, and 1984 returns (which Miller also prepared) were not timely filed with the IRS. Miller completed, signed, and dated the boxes at the bottom of the signature pages of each turn reserved for the paid preparer's use. The dates appearing next to her signature were as follows: ReturnDate198111/10/8219828/10/8319838/13/84198410/14/85No extensions had been obtained for petitioner's filing of the returns. On petitioner's 1979 return, he claimed a charitable deduction with respect to his December 1979 transfer to ULC-LB of cash, real estate mortgage notes, and silver bullion. The return, however, indicated *164 that ULC-Modesto, rather than ULC-LB, was the recipient of the contribution. The returns prepared for petitioner for 1980 through 1985 reflected that he had the following amounts of gross income: 1980 1981 1982 198319841985Business Income($ 5,000)-- -- ------or (Loss)Capital Gain582 $ 3,998 -- --$   2$ 2,600Dividends-- -- -- --15--Interest11,141 1,021 $ 9,027 $ 2,5762,788322Schedule E(98,456)(37,785)(5,020)2,6446,4444,071 The Schedule E gross income listed on the returns consisted of rental, royalty, and partnership income or losses. Substantial interest, real property sale, and rental income were omitted from the returns. On the 1980 through 1985 returns prepared for petitioner, no charitable deductions were claimed with respect to petitioner's transfers of cash and assets to ULC-LB during 1980 through 1985. In several instances, although petitioner transferred a rental real property he owned to ULC-LB during the middle of a year, a full year of depreciation was still claimed with respect to the property. The rental income collected after the transfer, however, was not reported on petitioner's return. Examination of Petitioner's Tax LiabilitiesRespondent commenced an examination *165 regarding petitioner's income tax liabilities for 1979, 1980, 1981, 1982, 1983, 1984, and 1985. Petitioner was not cooperative and refused to provide relevant information to the revenue agents conducting the examination. Petitioner referred the revenue agents to ULC-Modesto. When the agents issued administrative summonses to several financial institutions to secure records on the bank accounts petitioner and ULC-LB maintained, petitioner commenced actions in the U.S. District Court to have the summonses quashed. The District Court, however, enforced the summonses and the financial institutions provided the records sought by the revenue agents. Notices of DeficiencyRespondent issued notices of deficiency to petitioner for 1979, 1980, 1981, 1982, 1983, 1984, and 1985. In the notice of deficiency issued with respect to 1979, respondent, among other things, disallowed the charitable deduction for petitioner's claimed contribution to ULC-Modesto. In the notice of deficiency issued with respect to 1980 through 1985, respondent, among other things, determined petitioner to have large amounts of unreported interest, real property sale income, rents, royalties, and other taxable income. *166 Respondent further determined that such interest, real property sale income, rents, and royalties were solely taxable to petitioner. With respect to petitioner's other taxable income, the notice of deficiency stated as follows: a. It has been determined that you received other Taxable Income in the amounts determined in the schedule below which you did not report on any return. In the absence of adequate records, these amounts have been determined by reference to an analysis of your bank deposits and all other available information. Accordingly, income is increased under the provisions of the Internal Revenue Code for the taxable years ending December 31.198019811982Total Deposits$ 2,791,631 $ 3,194,543 $ 2,441,793 Less Sources:Per Return(50,280)0 (74,574)Per Report:Royalty(2,302)(4,629)(2,495)Interest(87,595)(164,638)(274,591)Property Sales(176,500)(1,866,104)Rents(338,824)(443,346)(415,388)Income Increase$ 2,312,630 $ 2,405,430 $          0 198319841985Total Deposits$ 3,304,757 $ 3,621,352 $ 5,212,149 Less Sources:Per Return(11,964)(9,253)(18,562)Per Report:Royalty(3,555)(1,032)0 Interest(225,919)(541,954)(456,412)Property Sales(881,917)(279,115)(1,538,911)Rents(253,474)(99,817)(13,428)Income Increase$ 1,927,928 $ 2,690,181 $ 3,184,836 Discovery *167 Requests and the Order Dated February 26, 1992Following the issuance of the notices of deficiency, petitioner filed his petitions and commenced the instant cases. On January 15, 1992, the Court held a hearing on respondent's request for sanctions concerning petitioner's failure to comply with the Court's prior November 19, 1991, order that petitioner produce certain documents and answer certain interrogatories. Following the January 15, 1992, hearing, the Court determined that petitioner had failed to comply with the prior order. 18 Among the documents respondent sought which petitioner failed to provide were those documents relied on by petitioner in alleging that respondent, for 1980 through 1985, had erroneously determined the amounts of petitioner's unreported capital gain, interest, rental, royalty, and other taxable income. Among the interrogatories to which petitioner failed to adequately respond was an interrogatory seeking the specific facts upon which petitioner relied in alleging that respondent, for 1980 through 1985, had erroneously determined petitioner's unreported taxable income. Additionally, another interrogatory to which petitioner failed to adequately respond *168 was an interrogatory seeking a description of petitioner's activities as an officer of ULC-LB during January 1, 1979, through December 31, 1985. On February 26, 1992, the Court entered an order imposing sanctions, which precluded petitioner from introducing in evidence any additional documents covered in respondent's document requests which had not been provided to respondent as of February 26, 1992. The February 26, 1992, order further precluded petitioner from presenting any testimony at trial which would be responsive to the interrogatories which petitioner had failed to adequately respond to. OPINION Statute of LimitationsSection 6501(a) provides the general rule that a deficiency in income tax shall be assessed within 3 years after a return is filed. The parties agree that, if the Court determines that petitioner failed to file a return for 1981, the applicable period of limitations has not expired. The Court has found *169 that petitioner failed to file a return for 1981. The return submitted to the IRS was neither sworn to nor signed by petitioner. An unsigned and unverified return does not start the running of the period of limitations. Lucas v. Pilliod Lumber Co., 281 U.S. 245 (1930); Reaves v. Commissioner, 31 T.C. 690, 713 (1958), affd. 295 F.2d 336 (5th Cir. 1961). Consequently, the period of limitations on assessment and collection of tax for 1981 had not expired prior to the time respondent issued her notice of deficiency. 1979 Charitable ContributionSection 170 generally allows deductions for charitable contributions where taxpayers can prove that contributions actually were made to a qualified tax-exempt organization, that no part of the net earnings of the qualified tax-exempt organization inured to the taxpayer's personal benefit. Sec. 170(a) and (c); Svedahl v. Commissioner, 89 T.C. 245, 251 (1987). In order to be entitled to a deduction under section 170, petitioner must establish that he made an unconditional gift to a qualified entity described in section 170(c)(2). Such entities are essentially those organizations that qualify for exemption from Federal income tax under section *170 501(c)(3). Sec. 170(c)(2); Hansen v. Commissioner, 820 F.2d 1464 (9th Cir. 1987), affg. an Order of this Court; see Graboske v. Commissioner, T.C. Memo. 1987-262. Qualified entities include corporations, trusts, community chests, foundations, or funds organized and operated exclusively for certain specified "exempt" purposes. To meet such operational test, an organization must establish that it engages primarily in activities which accomplish one or more exempt purposes specified in section 501(c)(3). An organization will not be so regarded if more than an insubstantial part of its activities is not in furtherance of an exempt purpose.Sec. 1.501(c)(3)-1(c)(1), Income Tax Regs. Petitioner bears the burden of proof. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Petitioner argues that ULC-LB was a qualified entity. He maintains that ULC-LB was a church under section 501(c)(3). Respondent, on the other hand, raises a number of other arguments why petitioner is not entitled to a charitable deduction. Respondent contends that petitioner formed ULC-LB for tax avoidance purposes. Respondent asserts that ULC-LB, in actuality, was petitioner's alter ego and did not have a separate *171 legal existence from petitioner. She further maintains that ULC-LB failed to satisfy the operational test of section 501(c)(3) and that there was inurement to petitioner. 19In connection with her latter two arguments, unlike in other prior Universal Life Church cases (e.g., Davis v. Commissioner, 81 T.C. 806, 816-818 (1983), affd. without published opinion 767 F.2d 931 (9th Cir. 1985)), respondent concedes that petitioner (ostensibly acting for ULC-LB) performed some charitable works and states that there is no definite evidence establishing that petitioner paid personal living expenses from the assets and funds held in ULC-LB's name. Respondent, however, asserts that the charitable activity was incidental and was far outweighed by the commercial, profit-making activities petitioner pursued. In the instant cases, ULC-LB was not a corporation, partnership, or joint venture. Although petitioner testified that ULC-LB, in effect, was an unincorporated association, the credible evidence of record reflects that ULC-LB was not an association. There are minutes for only 14 ULC-LB *172 board of directors meetings during the period from December 2, 1979 through December 21, 1985. Further, most of such minutes were prepared and signed by petitioner. These minutes also do not list the names of the directors and other persons who attended the purported board meetings. Notwithstanding the fact that ULC-LB's records included only minutes of 14 board of directors meetings, petitioner testified that ULC-LB's board of directors met frequently, deliberated various matters, and reached decisions by a majority vote. He elaborated that, from 1979 through 1985, up to 10 individuals served as directors of ULC-LB. Petitioner stated that individuals became directors of ULC-LB by "invitation from the present board". Under ULC-LB's bylaws, however, directors were to be selected annually every January 12. The bylaws provided that directors would be elected for 3-year terms. Further, the bylaws required a minimum of seven monthly meetings of the board of directors to be held during each year. Yet, ULC-LB's records do not reflect that any such elections were held, nor do such records include minutes for the minimum seven monthly meetings of the board of directors required annually *173 under the bylaws. The Court is not convinced that ULC-LB, in actuality, had a functioning board of directors. While the minutes of board meetings that are in evidence state that certain matters were decided by ULC-LB's board of directors, the Court is not convinced that such board of directors meetings actually took place. Further, petitioner failed to offer testimony from individuals named as directors of ULC-LB. The Court finds petitioner's testimony regarding ULC-LB's status as an unincorporated association not credible. Petitioner alone made all decisions concerning the expenditure of ULC-LB's "funds". Under ULC-LB's initial bylaws, petitioner and his family were the only ones allowed to make contributions to ULC-LB. Petitioner confirmed that no donations were ever solicited from others. Petitioner alone decided how funds and assets held in ULC-LB's name would be invested. Although bank and brokerage accounts were opened in ULC-LB's name and record title to real property was taken in its name, petitioner exercised sole control over the accounts and real estate. Petitioner and Philip Hughes were the only individuals who had signature authority over the accounts. Moreover, *174 although Philip Hughes was purportedly a director and ULC-LB's treasurer, 20 he had no knowledge and control of the accounts and real estate transactions involving real property held in ULC-LB's name. The Court finds that ULC-LB was not an unincorporated association. Petitioner has failed to establish that ULC-LB was a separate legal entity from himself. 21*175 See Rule 142(a). Additionally, petitioner has failed to establish that ULC-LB was operated primarily for exempt purposes. Petitioner, ostensibly acting for ULC-LB, engaged in numerous and extensive nonexempt profit-making activities during the years in issue. When questioned why ULC-LB's charitable expenditures were fairly minimal in comparison to its assets and financial resources, petitioner claimed that ULC-LB in its early years was still feeling its way and that he was attempting to build up its endowment to fund the performance of future charitable works. Even subsequent to 1985, however, petitioner essentially testified that rather than give money to certain other charitable organizations, such as the United Cambodian Community or Centro de la Raza, ULC-LB would instead make mortgage loans to them with the expectation that they would repay the interest on the loan and eventually the loan principal. Petitioner further was evasive when respondent inquired regarding *176 the time that he, ostensibly acting for ULC-LB, devoted to pursuing commercial activities versus charitable activities. Petitioner has failed to establish that ULC-LB satisfied the operational test of section 501(c)(3) and that it was operated primarily for exempt purposes. See Rule 142(a); see also Western Catholic Church v. Commissioner, 73 T.C. 196, 211-213 (1979), affd. without published opinion 631 F.2d 736 (7th Cir. 1980). In conclusion, petitioner has failed to establish that ULC-LB was a qualified entity described in section 170(c)(2). Consequently, the Court sustains respondent's disallowance of the charitable deduction petitioner claimed with respect to his purported 1979 transfer of funds and assets to ULC-LB. See Rule 142(a). ULC-LB's Status as a ChurchOne of petitioner's primary arguments has been that ULC-LB is a church and, therefore, any income earned from property held in its name would be exempt from Federal income tax. Further, petitioner argues that, as a church, ULC-LB was not required to file an application for exemption. See sec. 508(c)(1)(A); sec. 1.508-1(a)(3)(i)(a), Income Tax Regs. Because we have found that ULC-LB was not a separate entity from petitioner *177 and that property placed in the name of ULC-LB was under the control of petitioner, we need not decide whether ULC-LB qualifies as a church. 22Deposits to Bank and Brokerage AccountsAs indicated above, petitioner has failed to establish that ULC-LB was a separate legal entity. Petitioner also exercised sole control over the numerous bank and brokerage accounts opened in ULC-LB's name and over the personal bank accounts opened in the names of petitioner and Philip Hughes. Nevertheless, petitioner contends that to the extent the Court determines that deposits to the 40 accounts were from taxable income sources, only half of such taxable deposits should constitute unreported taxable income of petitioner. Petitioner asserts that the other half of such taxable income belonged to his brother, Philip Hughes. Petitioner testified that Philip Hughes has been his 50-percent partner in all investments. Petitioner claimed that he and Philip Hughes have had a *178 longstanding oral partnership agreement to that effect. The Court finds such testimony not to be supported by the record. The parties stipulated that Philip Hughes had no knowledge or control with respect to the accounts. No partnership returns were apparently ever filed for petitioner and his brother's alleged partnership. Neither does the record reflect that petitioner ever rendered any accounting to Philip Hughes with respect to their alleged partnership earnings which were deposited in the accounts. The 1979 through 1985 returns prepared for petitioner did reflect that Philip Hughes owned 50 percent of certain assets and that 50 percent of certain other interest, partnership, rental, and royalty income shown on the returns belonged to Philip Hughes. We find such statements on petitioner's returns to be self-serving. Although Philip Hughes, at his 1990 deposition, stated that he and petitioner were partners, the Court is not convinced an actual partnership existed. During his deposition, Philip Hughes gave few details regarding their alleged partnership and the scope of their alleged partnership investments. Petitioner failed to offer Philip Hughes' testimony at trial. Philip *179 Hughes' tax returns for 1979 through 1985 were not introduced in evidence. In light of petitioner's exercise of exclusive dominion and control over all the accounts, the mere fact that many of the personal bank accounts were titled as joint accounts does not establish that Philip Hughes held an actual ownership interest in the personal bank accounts. See Marcus v. Commissioner, T.C. Memo. 1992-234. Based on the credible evidence of record, the Court concludes that any deposits derived from taxable income sources constitute solely unreported taxable income of petitioner. Of the $ 24,144,508 in total gross deposits made into the accounts petitioner maintained in ULC-LB's name during 1980 through 1985, the parties agree that a total of $ 15,555,842 came from nontaxable sources and a total of $ 4,042,338 came from taxable income sources. This leaves in dispute a total of $ 4,546,328 of disputed deposits on the taxability of which the parties cannot agree. Petitioner contends that such $ 4,546,328 of disputed deposits were attributable partly to nontaxable return of capital sources and partly to taxable income sources. Respondent, on the other hand, asserts that the entire $ 4,546,328 *180 of disputed deposits represent unreported taxable income to petitioner. Of the $ 4,373,127 in total gross deposits made into the bank accounts petitioner maintained in his own name during 1980 through 1985, the parties agree that a total of $ 2,531,894 came from nontaxable sources and a total of $ 620,415 came from taxable income sources. This leaves in dispute a total of $ 1,219,818 of disputed deposits on the taxability of which the parties cannot agree. Petitioner contends that such $ 1,219,818 of disputed deposits were attributable partly to nontaxable return of capital sources and partly to taxable income sources. Respondent, on the other hand, asserts that the entire $ 1,219,818 of disputed deposits represented unreported taxable income to petitioner. The following table compares the combined total agreed taxable deposits and disputed deposits made into the 40 accounts, during 1980 through 1985, with the amounts of unreported income (excluding the real property sales income which is dealt with separately infra) determined in the notice of deficiency: Taxable Deposits and Disputed Deposits198019811982Taxable Deposits$ 891,188$ 621,367$ 750,332Disputed Deposits899,6131,610,9091,102,981Totals1,790,8012,232,2761,853,313198319841985Taxable Deposits$ 857,651$ 845,961$ 696,254Disputed Deposits768,7131,220,443163,487Totals1,626,3642,066,404859,741Unreported *181 Income Determined in Notice of Deficiency198019811982Unreported Income--Interest$ 87,595$ 164,638$ 274,591Rents338,824443,346415,388Royalty2,3024,6292,495Other taxableincome2,312,6302,405,430--Totals2,741,3513,018,043692,474198319841985Unreported Income--Interest$ 225,919$ 541,954$ 456,412Rents253,47499,81713,428Royalty3,5551,032--Other taxableincome1,927,928590,1813,184,836Totals2,410,8761,232,9843,654,676 For 1980, 1981, 1983, and 1985, the above unreported income amounts which respondent determined in the notice of deficiency exceed the combined total taxable and disputed deposits made into the 40 accounts. For such years, petitioner has the burden of proof and must establish that portions of the disputed deposits were attributable to nontaxable sources. See Rule 142(a). On the record presented, petitioner has failed to establish that any portion of the disputed deposits came from nontaxable sources. Petitioner offered into evidence various schedules reflecting petitioner's accountant's analysis of the disputed deposits. Respondent, however, generally disputes the accuracy of the analysis. 23*183 The accountant had been hired to reconstruct petitioner's taxable income for 1980 through *182 1985. He generally testified that the sources listed in the schedules were determined based on his analysis of certain documents and records he examined during the process of reconstructing petitioner's taxable income. However, the operative legal documents were not introduced into evidence. Without such evidence, there is no basis for a finding that the deposits arose from the sources listed in petitioner's schedules. Further, the Court cannot ascertain or even reasonably estimate the extent to which certain categories of listed items, such as escrow payments, loan repayments, or payments from Long Beach Classic Imports, were nontaxable or taxable. The accountant also examined certain check registers and checks essentially reflecting disbursements from various accounts to third parties. The registers were introduced in evidence. The accountant testified he deduced the sources of certain deposits made to other accounts from various annotations petitioner made on the registers concerning the disbursements. *184 The court, however, is not entirely satisfied that such annotations were contemporaneously made by petitioner. Also, since the registers listed only disbursements from certain accounts to third parties, the Court is not satisfied that the accountant correctly deduced and identified the source of the deposits made to other accounts. The Court notes that petitioner kept extremely poor records. Respondent, due to petitioner's inadequate records, reconstructed petitioner's taxable income, in large part, based on an analysis of his bank and brokerage accounts. Much of the documentation petitioner's accountant claims to have examined was not provided by petitioner during the examination conducted by the revenue agents. Also, it appears that such documentation was not produced to respondent even during pretrial discovery. Moreover, the accountant who testified was specifically hired by petitioner in preparation for litigation of the instant cases. The underlying documents for various transactions could well have been dispositive of the matter. Petitioner has offered no credible explanation for his failure to produce such documents during pretrial discovery and was precluded by the Court's *185 order dated February 26, 1992, from introducing such documents into evidence at trial. Accordingly, the Court does not accept the accountant's conclusory and inadequately substantiated testimony that the disputed deposits were primarily from nontaxable sources. Petitioner's confusion and disarray is further illustrated by the proposed findings he requested in his post-trial brief. He requests that the Court find that no portion whatsoever of the disputed deposits (including those made to bank accounts in his name) represented unreported taxable income. In his brief, petitioner made no attempt to identify what specific portions, if any, of the disputed deposits came from nontaxable sources. Yet, the parties' stipulation stated that petitioner contended that the disputed deposits were from both nontaxable and taxable sources. Petitioner has failed to establish that any portion of the disputed deposits were from nontaxable sources. See Rule 142(a). We hold that the combined disputed deposits and agreed taxable deposits, for all years in issue, other than 1982 and 1984, represent unreported taxable income of petitioner's. With respect to 1982 and 1984, the combined disputed and agreed *186 taxable deposits exceed the unreported income (excluding real property sales income) determined by respondent in the notice of deficiency. 24 To the extent that respondent is seeking an increased deficiency, respondent bears the burden of proof. See Rule 142(b). Petitioner, on the other hand, bears the burden of proof in establishing the determinations made in the notice of deficiency were erroneous. See Rule 142(a). In the notice of deficiency, respondent determined that for 1982, petitioner had a total of $ 692,474 in unreported interest, rental, and royalty income. Similarly, for 1984, respondent determined that petitioner had a total of $ 1,232,984 in unreported interest, rental, royalty, and other taxable income. The parties have agreed that for 1982 and 1984, respective deposits of $ 750,332 and $ 845,961, were from taxable income sources. With respect to 1982, respondent has failed to establish *187 that there were additional deposits from taxable income sources in excess of the $ 750,332 in agreed taxable deposits. With respect to 1984, respondent has failed to establish there were additional deposits from taxable income sources in excess of the $ 1,232,984 of unreported income (excluding real property sales income) determined in the notice of deficiency. See Rule 142(b). The Court concludes that a total of $ 750,332 in deposits represents unreported taxable income to petitioner for 1982. The Court further concludes that a total of $ 1,232,984 in deposits represents unreported taxable income to petitioner for 1984. See Rule 142(a). Taxable Gains Recognized From Real Property Sale TransactionsThe Court's findings, supra, detail the amounts and character of the taxable gains recognized, during 1980 through 1985, by petitioner with respect to various real estate sale transactions. For the same reasons discussed above concerning the taxable income deposits made into the bank and brokerage accounts petitioner maintained, the Court rejects petitioner's contentions that any portion of the taxable income recognized from real estate transactions represented taxable income of ULC-LB *188 or Philip Hughes. We conclude that all of the taxable gains recognized from real estate sale transactions constitute unreported taxable income to petitioner. Additions to TaxRespondent determined that petitioner was liable for the 50-percent addition to tax for fraud under section 6653(b) for 1979, 1980, and 1981, and under section 6653(b)(1) for 1982, 1983, 1984, and 1985. Respondent has the burden of proving, by clear and convincing evidence, that some part of the underpayment for each year in issue was due to fraud. Sec. 7454(a); Rule 142(b). Consequently, respondent must establish: (1) An underpayment by the taxpayer, and (2) that some part of the underpayment is due to fraud. King's Court Mobile Home Park, Inc. v. Commissioner, 98 T.C. 511, 515-516 (1992); Truesdell v. Commissioner, 89 T.C. 1280, 1301 (1987). Fraud is an intentional wrongdoing by the taxpayer with the specific purpose of evading a tax known or believed to be owing. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); McGee v. Commissioner, 61 T.C. 249, 256 (1973), affd. 519 F.2d 1121 (5th Cir. 1975). Respondent's burden of proving fraud is met if it is shown that the taxpayer intended to evade *189 taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Stoltzfus v. United States, supra at 1004; Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). The existence of fraud is a question of fact to be resolved from the entire record. DiLeo v. Commissioner, 96 T.C. 858, 874 (1991), affd. 959 F.2d 16 (2d Cir. 1992); Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). The taxpayer's entire course of conduct can be indicative of fraud. Stone v. Commissioner, 56 T.C. 213, 224 (1971). Because fraud can rarely be established by direct proof of the taxpayer's intention, fraud may be established by circumstantial evidence and reasonable inferences drawn from the record. DiLeo v. Commissioner, supra at 874-875; Rowlee v. Commissioner, supra at 1123. However, the mere suspicion of fraud is insufficient because fraud is not to be imputed or presumed. Carter v. Campbell, 264 F.2d 930, 935 (5th Cir. 1959). In Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601, the Ninth Circuit Court of Appeals set forth a nonexclusive list of circumstantial *190 evidence which may give rise to a finding of fraudulent intent. Such "badges of fraud" include: (1) Understatement of income; (2) maintenance of inadequate records; (3) failure to file income tax returns; (4) implausible or inconsistent explanations of behavior; (5) concealment of assets; and (6) failure to cooperate with tax authorities. On the record presented, the Court concludes that respondent has shown, by clear and convincing evidence, that petitioner is liable for the 50-percent addition to tax for fraud for 1980, 1981, 1982, 1983, 1984, and 1985, but not for 1979. Substantial income was omitted from the 1980 through 1985 returns prepared for petitioner. The returns omitted large amounts of interest, real property sales, and rental income. The parties stipulated that, during 1980 through 1985, the following deposits from taxable income sources were made into the personal bank accounts petitioner maintained: YearTaxable Income Deposits 1980$ 315,024198188,1941982101,280198364,891198439,388198512,638Petitioner agrees that such taxable income deposits represented taxable income to petitioner. These taxable income deposits were not reflected as income on petitioner's tax returns. *191 Substantial understatements of income for successive years are strong evidence of fraudulent intent. Rogers v. Commissioner, 111 F.2d 987, 989 (6th Cir. 1940), affg. 38 B.T.A. 16 (1938); Conforte v. Commissioner, 74 T.C. 1160, 1201 (1980), affd. in part, revd. on another issue 692 F.2d 587 (9th Cir. 1982); Otsuki v. Commissioner, 53 T.C. 96, 107-108 (1969); see also Baumgardner v. Commissioner, 251 F.2d 311, 316 (9th Cir. 1957), affg. T.C. Memo. 1956-112. Petitioner is an intelligent and financially astute individual. Despite his receipt of substantial income which he deposited into his personal bank accounts, petitioner failed to report such income on his tax returns. The record reflects the existence of other indicia of fraud. When asked by respondent why he failed to report such income, petitioner offered the implausible explanation that he believed that he had "done nothing wrong" and had no unreported income. 25*192 Petitioner further failed to maintain adequate records. He also declined to cooperate with the revenue agents assigned to examine his income tax liabilities. Respondent has met her burden of showing, by clear and convincing evidence, *193 that there were underpayments and that a portion of each underpayment was due to fraud. See Lollis v. Commissioner, 595 F.2d 1189, 1191 (9th Cir. 1979), affg. T.C. Memo. 1976-15. The Court finds that petitioner is liable for the 50-percent addition to tax for fraud under section 6653(b) for 1980 and 1981, and under section 6653(b)(1) for 1982, 1983, 1984, and 1985. The deficiency for 1979 is based on (1) the disallowed charitable deduction petitioner claimed with respect to his purported contribution to ULC-LB and (2) a partnership adjustment that petitioner conceded. Respondent contends that petitioner, like other taxpayers involved in prior cases who received Universal Life Church charters, engaged in a fraudulent, tax-evasion scheme. E.g., Wedvik v. Commissioner, 87 T.C. 1458, 1469 (1986); Fowler v. Commissioner, T.C. Memo. 1984-311. The Court has held that petitioner failed to establish that ULC-LB was a separate legal entity. Nevertheless, it is respondent's burden to show, by clear and convincing evidence, that some portion of the underpayment for 1979 was due to fraud. Sec. 7454(a); Rule 142(b). See Otsuki v. Commissioner, supra at 106. Respondent has failed to carry her *194 burden. Indeed, respondent concedes that petitioner, ostensibly acting for ULC-LB, performed some charitable works. Further, respondent acknowledges that there is no definite evidence establishing that petitioner used funds held in ULC-LB's name to pay his personal expenses. We hold that petitioner is not liable for the 50-percent addition to tax for fraud under section 6653(b) for the taxable year 1979. With respect to 1982, 1983, 1984, and 1985, respondent further determined that petitioner was liable for additions to tax for fraud under section 6653(b)(2). Under section 6653(b)(2), an addition to tax (equal to 50 percent of the interest payable under section 6601) is imposed with respect to the portion of the underpayment attributable to fraud. For purposes of the section 6653(b)(2) addition to tax, it is respondent's burden to establish, by clear and convincing evidence, the specific portion of the underpayment attributable to fraud. See Franklin v. Commissioner, T.C. Memo. 1993-184. 26*196 Respondent asserts that the entire underpayment for each year was attributable to fraud. She, however, has established, by clear and convincing evidence, only that the portions due to unreported *195 taxable income deposits to bank accounts in petitioner's name were attributable to fraud. With respect to the 29 accounts in ULC-LB's name, the Court essentially held that deposits to those accounts were taxable to petitioner because of petitioner's failure to establish that ULC-LB was a separate legal entity from himself. See supra p.42 and note 21. Respondent, however, cannot meet her burden of establishing fraud on the basis of petitioner's failure to discharge his burden of proof. Otsuki v. Commissioner, supra at 106. The Court holds that petitioner is liable for additions to tax under section 6653(b)(2) to the extent the portions of the 1982, 1983, 1984, and 1985 underpayments result from taxable income deposits made to accounts in petitioner's name. Respondent alternatively determined that petitioner was liable for 1979 for an addition to tax under section 6653(a) for negligence or intentional disregard of rules and regulations. Petitioner bears the burden of proving that respondent's determination is incorrect. Rule 142(a). Negligence is defined as a lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982); Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioner claims that he sought and relied upon professional advice from various advisers, including his personal attorney and personal accountant. Petitioner testified that representatives of ULC-Modesto instructed him to indicate on his tax return that a charitable contribution was made to ULC-Modesto, rather than to ULC-LB. 27*197 These individuals, however, were not independent, unbiased, objective advisers. With respect to the purported advice petitioner received from his personal attorney and personal accountant, the Court is not satisfied that such advisers were apprised of all the relevant facts, including the fact that no actual contribution was being made to ULC-Modesto. See Collins v. Commissioner, 857 F.2d 1383, 1386 (9th Cir. 1988), affg. Dister v. Commissioner, T.C. Memo. 1987-217. Petitioner testified that he consulted the attorney only as to ULC-LB's establishment, and not with respect to the 1979 charitable deduction. Indeed, petitioner stated that the accountant previously had voiced strong objections to petitioner's *198 joining the Universal Life Church, 28 and advised petitioner not to claim a charitable deduction for transfers to ULC-LB. Although reliance on the advice of qualified professional advisers may defeat a finding of negligence under certain circumstances, petitioner has not shown that the reliance in the instant case was reasonable. Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S.    , 111 S. Ct. 2631 0(1991). Moreover, petitioner offered no evidence concerning his exercise or lack of due care with respect to the $ 2,160 partnership adjustment conceded by him. The Court finds that petitioner has failed to establish that he was not negligent or that he had not intentionally disregarded rules and regulations. Consequently, the Court sustains respondent's determination that petitioner is liable for an addition to tax under section 6653(a) for 1979. Respondent determined that petitioner was liable for an addition to tax under section 6654 for failure *199 to pay estimated tax for 1981. As in effect for 1981, section 6654 contains no exception for reasonable cause or lack of willful neglect. See Petzoldt v. Commissioner, 92 T.C. 661, 702 (1989); Judge v. Commissioner, 88 T.C. 1175, 1188 (1987). Petitioner presented no evidence nor argument that any of the exceptions provided under section 6654 are applicable. Consequently, the Court sustains respondent's determination that petitioner is liable for an addition to tax under section 6654 for 1981. Section 6661 provides for an addition to tax for substantial understatement of income tax equal to 25 percent of the amount of any underpayment attributable to such understatement for the taxable year. To be considered substantial, the understatement must exceed the greater of $ 5,000 or 10 percent of the tax required to be shown on the return. Sec. 6661(b)(1)(A). The amount of the understatement is reduced by the portion of the understatement attributable to any nontax shelter item for which there is either substantial authority for the taxpayer's return position or adequate disclosure on the return. Sec. 6661(b)(2)(B). Petitioner understated his tax for 1982, 1983, 1984, and 1985, and *200 the respective understatements were substantial. He has not asserted that the understatements should be reduced under section 6661(b)(2)(B) or that respondent should have waived all or any part of the additions to tax under section 6661(c). We hold that petitioner is liable for an addition to tax under section 6661, for 1982, 1983, 1984, and 1985. To reflect the foregoing and certain adjustments agreed to by the parties, Decisions will be entered under Rule 155. Footnotes1. All section references are to the Internal Revenue Code as amended unless otherwise noted. All Rule references are to the Tax Court Rules of Practice and Procedure unless otherwise noted.↩1. Sec. 6653(b) for the tax years 1980 and 1981.↩2. 50 percent of the interest due on the entire deficiency for the year, all of which deficiency was determined by respondent to be attributable to fraud.2. At trial, petitioner testified that he and his family, upon arriving in North America, had been "church mice poor".↩3. On Aug. 28, 1984, the IRS revoked its prior ruling letter of Apr. 13, 1976, recognizing ULC-Modesto's tax-exempt status. The revocation was retroactively effective to May 1, 1977. ULC-Modesto subsequently brought a declaratory judgment action in the U.S. Claims Court to review the IRS determination that it was not exempt. The Claims Court, however, upheld the revocation on the ground that ULC-Modesto engaged in providing tax advice to others and in promoting tax avoidance, and that such activity constituted a substantial nonexempt activity disqualifying it for exemption under sec. 501(c)(3). See Universal Life Church, Inc. v. United States, 13 Cl. Ct. 567 (1987), affd. per curiam without opinion 862 F.2d 321↩ (Fed. Cir. 1988).4. Petitioner testified that he took a multiple choice examination based on the Bible, because ULC-Modesto recommended that applicants pass such an examination. ULC-Modesto, however, did not require such examination be taken in order for applicants to become Universal Life Church ministers. "The Universal Life Church" book provided to petitioner, states that "We will ordain anyone without question of their faith, for life, and without a fee." The book further states that ministers may ordain others using wallet-sized credentials obtained from ULC-Modesto.↩5. The following is an excerpt from the trial transcript: [Petitioner's counsel]: Mr. Hughes, calling your attention to 1978, did you make application in the year 1978 to become a minister of the Universal Life Church? [Petitioner]: I did, sir. [Petitioner's counsel]: And in order to become a minister of the Universal Life Church, was there any requirements of you before you were allowed to be a minister. [Petitioner]: They recommend that you take a test. You don't have to. Clearly, with my -- I thought my knowledge of religion, I would take it, of course, and prove it. And indeed I did, and I was ordained. [Petitioner's counsel]: But did you -- did they send you any kind of booklet, any kind of informational booklet for you to review before you took this test? [Petitioner]: Yes. It's -- it's rather like taking a driving test where you have multiple choice. They give you a book to read, which happens to be the Bible -- or they recommend you get a Bible. You can buy one. I didn't need it. And then they give you questions based on the Bible. Clearly, you can peg it and look through and find them. There's multiple choice. Any moderate student of the Bible could answer them easily. It's a simple test. Mustn't say it's anything but. It's a simple test. Don't have to take it. I did. * * * [Petitioner's counsel]: Now, after becoming a minister of the Universal Life Church, what did you do in the community to further that ministry? [Petitioner]: It wasn't required that I did -- [Petitioner's counsel]: I appreciate that.↩6. The parties are in dispute over whether ULC-LB was a separate legal entity from petitioner. The term "ULC-LB" is used for convenience and is not intended as an ultimate finding concerning ULC-LB's status as a separate legal entity. Similarly, the use of terms indicating that an investment was made by ULC-LB, that ULC-LB loaned funds or that certain property was transferred to or belonged to ULC-LB should not be construed as conveying any legal conclusion concerning the actual transfer or ownership of the property involved.7. See infra↩ note 8.8. Petitioner so testified. Additionally, ULC-Modesto's position has been that ULC-Modesto and all of its affiliated congregations constitute a single church that is exempt from Federal income tax under sec. 501(c)(3). See Universal Life Church, Inc. v. United States, 13 Cl.Ct. 567 (1987), affd. per curiam without published opinion 862 F.2d 321 (Fed. Cir. 1988) and supra note 3. Notwithstanding ULC-Modesto's position, the Court previously has held that other organizations which received Universal Life Church charters were not entitled to sec. 501(c)(3) status based on ULC-Modesto's exempt status. Universal Life Church (Full Circle) v. Commissioner, 83 T.C. 292, 295-300 (1984); see Davis v. Commissioner, 81 T.C. 806, 815 n.9 (1983), affd. without published opinion 767 F.2d 931↩ (9th Cir. 1985), and cases cited therein. In the instant case, however, petitioner contends that ULC-LB itself qualifies as a church under sec. 501(c)(3).9. The proviso that ULC-LB's assets, on dissolution, would go to ULC-Modesto was apparently required by ULC-Modesto. "The Universal Life Church" book provided petitioner stated as follows: The ULC Charter provides that any assets of any chartered church which are abandoned -- the Board of Directors is no longer functioning and none of the members wish to continue with the activities -- go to the "Mother Church, International Headquarters". We make this provision because we believe those assets might better be used by the ULC than by the state. It should be remembered that the property in one tax-exempt unit can only be given↩ to another tax exempt organization.10. Although petitioner acknowledged he signed the Form 1024, he claims to have not seen this statement. He stated that he either had not read all of the Form 1024 prepared by his former counsel or that he possibly might have executed the signature page of the Form 1024 without seeing the other pages ultimately filed with the IRS.↩11. There are approximately 14 troy ounces in an avoirdupois pound.↩12. Petitioner testified that from 1980 through 1985, the interest rates paid on the real estate mortgage loans he and ULC-LB invested in were generally 6 to 12 percentage points higher than the interest rates paid on certificates of deposit.↩13. Petitioner testified that these were among the reasons why the real estate mortgage loans he and ULC-LB invested in were required to be arranged through a mortgage broker.14. Petitioner testified that typically Pack's corporation, or the other agent employed, would be assigned back the loan for the purpose of instituting foreclosure proceedings against the property. He essentially stated that usually the second mortgage recorded against the property would reflect the mortgage loan broker (from whom petitioner and ULC-LB purchased the mortgage loan) to be the secured party. After successfully foreclosing and obtaining the property, the agent would then convey title to the property to petitioner and ULC-LB.↩15. Subsequent to trial, the parties filed a supplemental stipulation and exhibit containing the information set forth in the table above. However, the Court computes that for 1982 the long-term capital gain was $ 235,303 and the short-term capital gain was $ 19,478. The discrepancy between the Court's computation and the parties' stipulation possibly may be attributable to the parties' characterizing the $ 5,669 of taxable gain recognized on the sale of the 2486-2488 1/2 Pasadena Avenue property as long-term, as opposed to short-term, capital gain. The Court directs the parties to resolve this computational matter in the Rule 155 proceedings.↩16. Petitioner explained that the mortgage loans on the properties were not assumable and, under the loan agreements, the loan was required to be fully repaid upon transfer of the property. He related that the mortgage holders, if aware the property had been transferred, would seek immediate full repayment of the loan because the interest rates paid on the existing loans were much lower than the current interest rates paid on new loans. Petitioner stated that ULC-LB reimbursed him for the loan payments he made.↩17. As previously indicated, ULC-LB's office and operational headquarters were located at petitioner's residence.↩18. In opposing respondent's request for sanctions, petitioner's counsel claimed that he had already spent much time and money in attempting to comply with the discovery requests and that he had essentially produced all information that was currently available.↩19. Respondent has not raised any argument that a charitable deduction is disallowed under sec. 508(d)(2)(B).↩20. Petitioner stated that Philip Hughes played an active role in ULC-LB. According to petitioner, his brother, as of the time of trial, was still a minister and parishioner of ULC-LB. Petitioner, however, has not explained a number of inconsistencies between petitioner's testimony and other evidence, including Philip Hughes' statements at a 1990 deposition involving litigation between ULC-LB and Pack. The parties stipulated that Philip Hughes was ULC-LB's treasurer. Minutes of a ULC-LB board of directors meeting, dated Jan. 12, 1980, also reflect that Philip Hughes was named as ULC-LB's treasurer. Yet, Philip Hughes, at his deposition, stated that another individual, Mary Lonn, was ULC-LB's treasurer from 1979 through approximately 1987, and that he had been ULC-LB's secretary since ULC-LB's inception.↩21. Petitioner has not argued that he, in actuality, created and was operating a charitable trust. Cf. United States v. Moon, 718 F.2d 1210, 1220-1222, 1223-1226↩ (2d Cir. 1983). Rather, he contends solely that ULC-LB was a church under sec. 501(c)(3).22. In any event, even if we found that ULC-LB was a separate entity from petitioner, ULC-LB does not appear to satisfy many of the criteria discussed in Foundation of Human Understanding v. Commissioner, 88 T.C. 1341, 1357-1358↩ (1987).23. For example, the following is the schedule of what petitioner contends were the sources of the disputed deposits made into petitioner's personal bank accounts: PERSONAL ACCOUNTSDisputed Deposits:198019811982Principal$ 487,694$ 166,191$ 302,416Receipts from Escrows02,8880Transfers from Non-ULC accounts27,75800Transfers from ULC accounts5,79411,84716,500Receipts from Long Beach Classic57,66810,0000ImportsUnknown Sources29,2629,177187$ 608,176$ 200,103$ 319,103PERSONAL ACCOUNTSDisputed Deposits:198319841985Principal$ 32,955$ 33,301$ 6,334Receipts from Escrows000Transfers from Non-ULC accounts000Transfers from ULC accounts11,2526,4231,172Receipts from Long Beach Classic000ImportsUnknown Sources001,000$ 44,207$ 39,724$ 8,506 We note that petitioner's disputed deposits schedule reflects a total of $ 8,506 while the stipulated schedule reflects the amount of $ 8,505. It may be that rounding off amounts to the nearest full dollar amount created this discrepancy.1Respondent agreed that petitioner's records do reflect that deposits in the amounts specified above arose from payments from Long Beach Classic Imports. Petitioner, however, failed to establish any reasonable basis for the Court to even estimate what portion of such payments were nontaxable, as opposed to taxable. The Court declines to speculate whether a portion of such payments was nontaxable.24. Although respondent technically has not filed an amended answer seeking increased deficiencies for 1982 and 1984, in light of the parties' stipulations regarding deposits to the accounts, the issue of such increased deficiencies was tried by consent of the parties. See Rule 41(b).↩25. Petitioner testified as follows: [Respondent's counsel]: Mr. Hughes, during the course of your testimony the last couple of days, and especially yesterday, we saw instances where you did not report on your own tax return taxable income from your rental properties, or the sale of your properties. [Petitioner]: Whose properties? [Respondent's counsel]: That you held in your name, or maybe with your brother. And in the stipulation, there is almost $ 600,000 of taxable income deposits during these years. Now, my question to you is can you explain to the Court what reason you had not to report on your income tax returns the taxable income deposits to which you stated, the rental income that we know you did not report on your return, and the gain from the sale of properties you did not report on your return? [Petitioner]: My answer has to be twofold, I think. [Respondent's counsel]: Um-hmm. [Petitioner]: One, if I had done so it would surely be a criminal offense, and I should not be sitting in a civil court now. I have done nothing wrong. I don't understand your question in that, and I know what you're telling me in the stipulation, but there is no undeclared income on my part, never has been and never would be.↩26. The burden-shifting provision, subsequently enacted and redenominated as sec. 6653(b)(2), is not applicable to the years in issue. Under such statutory provision, if respondent establishes that any portion of an underpayment is attributable to fraud, the taxpayer then must establish the portion of the underpayment that is not attributable to fraud. The provision was added by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1503(a), 100 Stat. 2742, and is effective for returns the due date for which (determined without regard to extensions) is after Dec. 31, 1986. See Tax Reform Act of 1986, Pub. L. 99-514, sec. 1503(e), 100 Stat. 2743.27. As ULC-Modesto previously had received a favorable ruling letter from the IRS recognizing its exempt status, such action possibly would reduce the likelihood of the IRS' challenging petitioner's claimed charitable deduction. See Bob Jones University v. Simon, 416 U.S. 725, 729-730 (1974); The Synanon Church v. Commissioner, T.C. Memo. 1989-270. But see Davis v. Commissioner, 81 T.C. 806, 815-819 (1983) affd. without published opinion 767 F.2d 931↩ (9th Cir. 1985), where the Court held that a taxpayer had failed to establish that actual contributions were made to ULC-Modesto.28. Petitioner claimed the accountant's objections were based on religious grounds as the accountant was a Presbyterian. The Court does not accept this aspect of petitioner's testimony.↩